**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VYC TRADING, LLC, GONZALO DOTTORI, VALOGIC, LLC,<br><br>Plaintiffs,<br><br>-against-<br><br>JONATHAN “BENJAMIN” GREENWALD, MASADA FUNDING, LLC, MENACHEM “MENDY” RASKIN, TIMELESS FUNDING, LLC, ISAAC “PAUL” LOUZ, EZ CAPITAL, LLC, AND GOTHAM CITY CAPITAL, LLC,<br><br>Defendants. | Case No.: 1:26-cv-00076-JAV |

## SECOND AMENDED COMPLAINT

Plaintiffs VYC TRADING, LLC, Gonzolo Dottori (“VYC”), VaLogic, LLC (collectively, “Plaintiffs”), by and through their attorneys, Heskin & Proper, PLLC, allege as against Defendants Jonathan “Benjamin” Greenwald, Masada Funding, LLC (Masada”), Menachem “Mendy” Raskin, Timeless Funding, LLC, Isaac “Paul” Louz, Lendora Capital, LLC, EZ Capital, LLC, and Gotham City Capital, LLC (collectively, “Defendants”), upon knowledge as to their own actions, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1. This action seeks damages arising out of a fraudulent and extortionate loan sharking scheme perpetrated by Defendants.

2. The scheme is led by Defendants Greenwald and Raskin, who use Defendants Masada, Timeless, Lendora, and EZ Capital as a front for their RICO Enterprise (the Enterprise”).

3. The scheme employs a series of fraudulent devices and ruses to lure their victims into their fraudulent loan sharking scheme.

4. Among their schemes and devices is a carroting scheme where Defendants promise their vulnerable victims a desperately needed long-term loan at low interest rates—if and only if—they take and payoff—one of their criminally usurious high-interest loans, disguised as a merchant cash advance ("MCA loan").

5. In perpetrating this fraudulent and unlawful scheme, Defendants provide fraudulent documents purporting to be preapprovals from lenders, which are in reality, nothing more than shams.

6. For example, Defendants lured Plaintiff VYC into taking a criminally usurious loan from Masada by providing VYC with a fake loan document from Prudential Capital Funding for $1,680,000 over 24 months.

7. In purported exchange for this long-term loan, Defendant Gotham City Capital represented that Plaintiff VYC would need to take out and payoff a $200,000 short-term loan with Masada, with a payback of $300,000.

8. On June 15, 2023, Defendants advanced VYC $180,000 and withdrew 10 payments of $5,996 for a total of $59,960.

9. On June 21, 2023, Defendants sent VYC a contract from Prudential promising an additional advance of $1,680,000. *See* Ex. 1.

10. Plaintiff VYC was told that if he paid off the Masada loan early, Prudential would then fund the new long-term loan.

11. As a direct result of this promise and at Defendants' direction, VYC wired Defendants $245,000 on June 30, 2023, which was more than what was contractually owed.

12. Despite fully paying off the MCA loan with Masada, Defendants continued to debit and overdraw an additional two payments totaling $11,992.

13. Thus, in total, VYC received $180,000 and paid back $316,952 over a span of just—two weeks. That is an interest rate of 1,978%.

14. When Plaintiff VYC complained about the overdraw, Defendants laughed at Plaintiff Dattoli mocking his minority status and inability to protect himself.

15. Defendants also employ a scheme to extort their victims when they cannot pay by freezing their bank accounts through Connecticut's prejudgment attachment statute.

16. Defendants abuse this prejudgment remedy despite having literally no connection to Connecticut, while residing and operating solely out of New York.

17. According to Bloomberg News, this Connecticut loophole was used more than 180 times in 2021. The result of this tactic is often catastrophic because predatory lenders can freeze out-of-state bank accounts without any notice whatsoever. Once frozen, these predatory lenders can then extort payment under duress due to their victims' need to save payroll or pay other necessary business expenses, such as insurance, taxes, rent and inventory.

18. This tactic is especially harsh because even when the small business victim capitulates to their extortionate demands, it is often too late because the release of those bank accounts may take days to unfreeze due to the processing delays and procedural constraints of individual banks and their levy departments.

19. As a direct result of these abuses, the Connecticut Legislature amended the statute to curb these abuses. *See* *https://debanked.com/2025/02/connecticut-introduces-bill-on-ex-parte-prejudgment-remedies-for-mcas/*

20. Despite these amendments, Defendants continue to use this unlawful and extortionate tactic in an attempt to force Plaintiffs and others to pay on their criminally usurious loans, which is a Class D felony in both New York and Florida.

21. In an attempt to disguise their criminally usurious loans, Defendants label their criminally usurious loans as MCAs.

22. In reality, the MCAs are nothing more than loans charging interest rates exceeding 300% in violation of the criminal laws of New York and Florida. *See* N.Y. Penal Law § 190.40 and Fla. Stat. §§ 687.03, 687.04, 687.071(7).

23. Plaintiffs, as a direct and proximate result of Defendants' misconduct, incurred financial harm and was subjected to unlawful and coercive payment demands, creating risk of non-compensable harm.

24. Defendants' actions constitute a pattern of racketeering activity and/or the collection of unlawful debt in violation of RICO, including through the use of interstate wires and electronic banking systems to solicit, document, fund, and collect the unlawful obligations.

25. This Complaint seeks damages under RICO, 18 U.S.C. §§ 1961 et seq., and fraud.

## THE PARTIES

26. Plaintiff VYC Trading is a limited liability company organized in the State of Florida, with its principal place of business located 8140 NW 29th Street, Miami, Florida.

27. Plaintiff Gonzalo Dottori is a natural person and a citizen of Argentia.

28. Plaintiff VaLogic is a limited liability company located in Maryland. It's sole member is William Robertson, who is a citizen of Maryland.

29. Defendant Jonathan Greenwald is an individual citizen residing at 3912 Cypress Avenue, Brooklyn, NY 11224.

30. Defendant Menachem Raskin is an individual citizen residing at 265 Bowery Street, Apt. 2NE, Manhattan, New York 10002.

31. Defendant Limitless Funding, LLC is a corporation organized under the laws of New York and is located at 5014 16th Ave, STE 124, Brooklyn, NY 11219. All its members are citizens of New York.

32. Defendant Isaac "Paul" Louz is an individual citizen residing at 2241 W. First Street, Brooklyn, New York 11223.

33. Defendant EZ Capital, LLC is corporation organized under the laws of New York with a registered agent located at 6 Windsor Road, Great Neck, NY 11021. All its members are citizens of New York.

34. Defendant Gotham City Capital, LLC is corporation organized under the laws of New York with a registered agent located at 1914 New York Ave, Brooklyn, NY 11210. All its members are citizens of New York.

**JURISDICTION AND VENUE**

35. Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue, or has selected New York as the forum for all disputes related to the transactions.

36. This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68 ("RICO").

37. The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

38. This Court has original jurisdiction based upon 28 U.S.C. § 1332(a) because no Plaintiff is a citizen of the same state as Defendant and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

39. This Court also has jurisdiction under 28 U.S.C. § 2201 et. seq.

40. Venue is proper because each Defendant regularly conducts business within this judicial district.

## THE TRANSACTIONS AT ISSUE

### VaLogic

71. On March 28, 2023, VaLogic entered into a loan with Timeless. *See* Ex. 2.

72. The net loan amount was $311,800 after deducting $55,000 in purported origination fees and holding back $183,211 to cover the first 20 payments, and the payback amount was $824,450. *See* Ex. 3 (addendum).

73. The daily payment was $9,160.56, resulting in a term of 18 weeks and an interest rate of 680% on its face. The fixed term was confirmed in an email after funding:

| | | | |
|---|---|---|---|
| **DEAL NAME** | VALOGIC LLC | | |
| **Debiting As** | Timeless | **Fund VIA** | ACH |
| **Net Funding Amount** | $311.800.00 | **Daily Debit** | $9,160.56<br>No payments for 20 days |
| **Receivables Purchased** | $824,450.00* | **Term** | 90 days |
| **Routing #** | 052000113 | **Account #** | 9884624843 |
| **Merchant's Name** | WILLIAM C ROBERTSON | **Phone #** | 304-283-2008 |
| **Merchant's Email** | bill.robertson@valogicbio.com | | |
| **Broker On Deal** | NA | **Broker Phone** | ***-***-**** |

***Receivables purchased total is $687,500.00 if paid in full by april 26 2023**

71. After fully repaying all amounts due through a refi loan with Masada, Timeless nevertheless demanded an additional three payments as a means to extort even more unlawful interest to receive a zero balance letter. A copy of the wire transactions is below:

| | | | | |
|---|---|---|---|---|
| 05/12/2023 | OUTGOING FEDWIRE FUNDS TRANSFER BRANCH TIMELESS FUNDING LLC | | 27,900.00 | |
| 05/12/2023 | WIRE TRANSFER FEE | | 32.00 | 9,461.85 |

72. On May 3, 2023, ValLogic entered into a loan with Masada. *See* Ex. 4.

73. The net loan amount was $351,788 after deducting $55,000 in purported origination fees and holding back $143,211.11 for the first 20 payments, and the payback amount was $824,450.

74. The daily payment was $9,160.56, resulting in a term of 18 weeks and an interest rate of 645% on its face. The fixed term was confirmed in an email after funding:

| | MERCHANT FUNDING EMAIL | | |
|---|---|---|---|
| **Program Name** | **MASADA FUNDING** | | |
| **Deal Name** | VaLogic LLC | | |
| **Funding Account / DBA** | VaLogic LLC | | |
| **Funding $ Amount** | $550,000.00 | DAILY DEBITS | $2,500.00 a day/$9,170.56 starting 25 days after |
| **NET FUNDING AMOUNT:** | **$351,788.89** | **Bank Fee** | 10% |
| **Receivables Purchased** | $824,450.00 | **Balance Refi** | N.A |
| **Flex Wires** | **N.A** | | |
| **Routing #** | 052000113 | Account # | 9884624843 |
| **Merchants Name** | Robertson William | **Phone number** | (304) 283-2008 |
| **Merchants Email** | bill.robertson@valogicbio.com | | |

75. On June 5, 2023, VaLogic entered into another loan with Masada. *See* Ex. 5.

76. The net loan amount was $630,000 after deducting $70,000 in purported origination fees, and the payback amount was $1,049,300.

77. The daily payment was $9,539.09, resulting in a term of 23 weeks and an interest rate of 234% on its face. The fixed term was confirmed in an email after funding:

| | MERCHANT FUNDING EMAIL | | |
|---|---|---|---|
| Program Name | MASADA FUNDING | | |
| Deal Name | ValLogic LLC | | |
| Funding Account / DBA | ValLogic LLC | | |
| Funding $ Amount | $700,00.00 | DAILY DEBITS | $9,539.09 |
| NET FUNDING AMOUNT: | $630,000.00 | Bank Fee | $70,000.00 |
| Receivables Purchased | $1,049,300.00 | Balance Refi | N.A |
| Flex Wires | N.A | | |
| Routing # | 052000113 | Account # | 9884624843 |
| Merchants Name | Robertson William | Phone number | (304) 283-2008 |
| Merchants Email | bill.robertson@valogicbio.com | | |
| | | | |

78. On June 28, 2023, VaLogic entered into a loan with E-Z Capital. *See* Ex. 6. This contract was fake and is nothing more than a white label used by the Enterprise.

79. The net loan amount was $225,000 after deducting $25,000 in purported origination fees, and the payback amount was $324,750.

80. The daily payment was $7,495, resulting in a term of 10 weeks and an interest rate of 543% on its face.

81. On July 26, 2023, VaLogic entered into a loan with Lendora. *See* Ex. 7. This contract was fake and is nothing more than a white label used by the Enterprise.

82. The net loan amount was $0 after deducting $831,739 to payoff the prior June 5 Masada loan and $254,830 to payoff the March 28, 2023 Masada loan, and the payback amount was $1,648,900.

83. The daily payment was $10,493, resulting in a term of 32 weeks and an interest rate of 140% on its face even assuming it was simply a refinance of the other two loans and not just additional interest charged on the two prior loans, which it was.

84. Even after VaLogic fully repaid Lendora, Defendants continued to over debit and extort VaLogic, as demonstrated by the text messages with VaLogic and Defendant Greenwald:




71. The net loan amount was $125,000 after deducting $25,000 in purported origination fees, and the payback amount was $225,000.

72. The daily payment was $4,497, resulting in a term of 6 weeks and an interest rate of 290% on its face

## VYC Trading

73. On June 15, 2023, VYC entered into a loan with Masada. *See* Ex. 8.

74. The loan amount was $180,000 after deducting $20,000 in purported origination fees, and the payback amount was $299,800. *See* Ex. 8.

75. The daily payment was $5,996, resulting in a term of ten weeks and an interest rate of 347% on its face.

76. The daily payment purported to represent 25% of VYC's receivables. That was a sham. According to Defendants' own underwriting documents, VYC's estimated receivables was approximately $1.2 million. *See* Ex. 9. Accordingly, Defendants estimated VYC's daily estimated receivables to be $13,636 per business day (1.6M x .25 = $400k/22 business days = $18,181).

77. Simple math therefore demonstrates that Defendants calculated the daily payment based on their intended term—not the purported percentage of receivables purchased.

78. To be sure, Defendants' underwriting stated the term was 50 days. *See* Ex. 9:

LOGIN REQUEST: VYC Trading LLC
MERCHANT NAME: Dottori
MERCHANT EMAIL: gd@vyc-group.com
MERCHANT NUMBER: 305-39-92166
DEAL DETAILS: 200K / 50 DAYS
ISO & ISO REP: Gotham City Capita/ Mendy

79. The fixed term was also confirmed in an email after funding:

| | MERCHANT FUNDING EMAIL | | |
|---|---|---|---|
| Program Name | MASADA FUNDING | | |
| Deal Name | VYC TRADING LLC | | |
| Funding Account / DBA | VYC TRADING LLC | | |
| Funding $ Amount | $200,000.00 | DAILY DEBITS | $5,996.00 |
| NET REFI FUNDING AMOUNT: | $180,000.00 | Bank Fee | $20,000.00 |
| Receivables Purchased | $299,800.00 | Balance Refi | |
| Flex Wires | N.A | | |
| Routing # | 063105513 | Account # | 6113774597 |
| Merchants Name | Dottori Gonzalo | Phone number | 305-39-92166 |
| Merchants Email | gd@vyc-group.com | | |

80. As a direct result, the reconciliation provision was illusory. Because Defendants did not tie the daily payment to the actual receivables, VYC's receivables could drop by 50% and if it sought to utilize the reconciliation provision, the daily payment would go up, not down.

81. In addition, Defendants knew VYC could not afford to pay the criminally usurious interest charged or the fixed daily payments because Defendants' own underwriting showed that VYC was overleveraged and that the MCAs were collectively taking 49% of its receivables. *See* Ex. 9:

**Current position**
**Fintap $20,938 weekly**
**Apex $20,938 weekly**
**Apex $16,875 weekly**
**Rowan Capital $15,535.71 weekly**
**Cucumber capital $16,111.11 weekly**

**Average monthly revenue (3 mo): $**
**Average monthly revenue (6 mo): $**
**Adjusted Average monthly revenue: $**

Next Deposit: 3/4 weekly, today $70k

Business Model:wholesale electronics for used phones

Source of revenue: wires

Time open: 2018

Use of Funds: Inventory

Leverage-
Without us: - **$308,795.6 being pulled monthly - 31%**
With us: $23,467.93 Per Day - **$492,826.6 being pulled monthly - 49%**

97. The reconciliation provision was also knowingly illusory because Defendants knew that VYC was in default from day one because it did not own clear title to its receivables due to the five different MCA positions known by Defendants at the time of underwriting. *Compare* Ex. 8, § 2.12 with *People v. Richmond Capital Group LLC*, 80 Misc. 3d 1213(A), at *20 (N.Y. Sup. Ct. 2023) ("Additionally, Section 2.9 of the MCAs makes clear that any encumbrance of the collateral would make the full amount immediately due and payable and that the Predatory Lenders could enforce the personal guaranties that they required the Borrowers to provide. Thus, bankruptcy never relieved the Borrowers or the guarantors of their obligation under the MCAs or the guaranties."); Ex. 9:

**Current position**
**Fintap $20,938 weekly**
**Apex $20,938 weekly**
**Apex $16,875 weekly**
**Rowan Capital $15,535.71 weekly**
**Cucumber capital $16,111.11 weekly**

98. In light of this highly leveraged position, Defendants devised a scheme for a "smash and dash" through a carroting scheme, which was devised from inception.

99. Prior to funding the original loan, Defendants provided VYC with an early pay addendum promising to provide a 15% discount in the event that it was paid within the next 20 days. *See* Ex. 10.

100. After funding the loan, Defendants then conspired together to send VYC a fake loan in the amount of $1,680,000, dated June 21, 2023 with a ridiculously insane low daily payment of $2,683. *See* Ex. 1. In doing so, Defendants conspired together, through Gotham City Capital, to represent to VYC that if it paid off the Masada loan early, it would be approved for the $1,680,000 loan.

101. Despite the fact that only 239,840 was owed pursuant to the early pay discount, VYC was instructed to pay $245,000, with the promise that any overpayments would be refunded when cleared.

102. VYC fell for the scam and wired $245,000 to Masada on June 29, 2023:

| | | |
|---|---|---|
| 06/29/23 | WT FED#00568 OPTIMUMBANK /FTR/BNF=MASADA FUNDING LLC SRF# 0066132180893851 TRN#230629194526 RFB# | $245,000.00 |

103. When VYC demanded a refund for the amounts overpaid, Defendant Greenwald attempted to deflect the blame by suggesting that Gotham was the one who instructed the payments:

On July 11, 2023 at 2:39:25 PM, Admin Department (admin@fundingservicing.com) wrote:

Please speak with your representative on this file, someone from Gotham capital as he had requested us to send money to him on your behalf. We didn't fund this deal directly , this was a deal that we syndicated with on Gotham

On Tue, Jul 11, 2023 at 1:11 PM Gonzalo Dottori <gd@vyc-group.com> wrote:

Thanks. Please let me know when u are ready to return the funds.

104. The representation is false. At no time did VYC instruct Gotham to receive money on VYC's behalf and the explanation provided defies all notions of common sense. VYC had overpaid and demanded a refund. Moreover, Gotham is an Independent Sales Office, i.e, broker, according to Masada's own underwriting records:

ISO & ISO REP: Gotham City Capita/ Mendy

105. On information and belief, Defendant Mendy Raskin is the Mendy referenced above, and it who the Enterprise used to employ the fraudulent "carroting" scheme.

106. But even if true (which it is not), Masada is still responsible for the representations and acts of its agent.

## RICO ALLEGATIONS

### A. The Greenwald and Raskin Enterprise

107. Defendants Greenwald, Raskin, Masada, EZ Capital, Lendora and Gotham City Capital are associated together for a common purpose: to solicit merchants seeking working-capital financing with "consolidation" pitches, paper unlawful loans as purported receivables purchases, extract outsized broker/origination fees, and collect unlawful debt through fixed remittances and coercive enforcement.

108. The association-in-fact enterprise (the "Greenwald Enterprise") had an ongoing structure, including coordinated solicitation (broker), standardized contract documentation (lender), shared financial incentives (fees and yield), and collection mechanisms (scheduled remittances and enforcement).

109. The Greenwald Enterprise operated through a division of labor.

110. Masada, EZ Capital and Lendora functioned as the Enterprise's funding and documentation arm: they provided the capital, drafted and supplied standardized form agreements and authorizations, imposed fixed remittance schedules and default remedies, and collected payments through scheduled electronic withdrawals and enforcement mechanisms.

111. Greenwald and Raskin functioned as directing and supervisory participants in the Enterprise by overseeing and directing, directly or indirectly, the funding, documentation, and collection practices used to originate, service, and collect upon the unlawful obligations, including through standardized forms and scheduled electronic debits.

112. Gotham City Capital acted as the broker that solicited the deals.

113. On information and belief, Raskin also functioned as a broker.

114. Defendants shared a common purpose and financial incentives: the successful placement and funding of high-cost transactions that generated (i) upfront fees and deductions (including broker compensation and origination-type charges) and (ii) ongoing collections through fixed remittances.

115. The Enterprise engaged in interstate commerce and used the instrumentalities of interstate commerce, including emails, telephone communications, electronic signature platforms, wire transfers, and ACH debits to solicit, contract, fund, and collect the unlawful obligations.

116. The debt Defendants sought to collect constitutes "unlawful debt" within the meaning of 18 U.S.C. § 1961(6) because it was incurred in connection with Defendants' business of lending money in substance; it is unenforceable in whole or in part under New York and Connecticut law (including, at minimum, criminal usury principles applicable to disguised loans); and the interest/charges exceeded at least twice the maximum enforceable rate.

117. Defendants' conduct also involved repeated uses of interstate wires in furtherance of a deceptive scheme to mischaracterize the transaction's true nature, cost, and consequences (including the "consolidation" pitch and the disguising of a loan as a receivables purchase).

**B. The Louz Enterprise**

118. Defendants Louz and Timeless are associated together for a common purpose: to solicit merchants seeking working-capital financing with "consolidation" pitches, paper unlawful loans as purported receivables purchases, extract outsized broker/origination fees, and collect unlawful debt through fixed remittances and coercive enforcement.

119. The association-in-fact enterprise (the "Louz Enterprise") had an ongoing structure, including coordinated solicitation (broker), standardized contract documentation (lender), shared financial incentives (fees and yield), and collection mechanisms (scheduled remittances and enforcement).

120. The Louz Enterprise operated through a division of labor.

121. Timeless functioned as the Enterprise's funding and documentation arm: it provided the capital, drafted and supplied standardized form agreements and authorizations, imposed fixed remittance schedules and default remedies, and collected payments through scheduled electronic withdrawals and enforcement mechanisms.

122. Louz functioned as directing and supervisory participant in the Enterprise by overseeing and directing, directly or indirectly, the funding, documentation, and collection practices used to originate, service, and collect upon the unlawful obligations, including through standardized forms and scheduled electronic debits.

123. Defendants shared a common purpose and financial incentives: the successful placement and funding of high-cost transactions that generated (i) upfront fees and deductions (including broker compensation and origination-type charges) and (ii) ongoing collections through fixed remittances.

124. The Enterprise engaged in interstate commerce and used the instrumentalities of interstate commerce, including emails, telephone communications, electronic signature platforms, wire transfers, and ACH debits to solicit, contract, fund, and collect the unlawful obligations.

125. The debt Defendants sought to collect constitutes "unlawful debt" within the meaning of 18 U.S.C. § 1961(6) because it was incurred in connection with Defendants' business

of lending money in substance; it is unenforceable in whole or in part under New York and Connecticut law (including, at minimum, criminal usury principles applicable to disguised loans); and the interest/charges exceeded at least twice the maximum enforceable rate.

126. Defendants' conduct also involved repeated uses of interstate wires in furtherance of a deceptive scheme to mischaracterize the transaction's true nature, cost, and consequences (including the "consolidation" pitch and the disguising of a loan as a receivables purchase).

## FIRST CAUSE OF ACTION
## (RICO – 18 U.S.C. § 1962(c))

127. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

128. Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

### The RICO Enterprises

129. Defendants, through their coordinated conduct, jointly operated and managed an enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of an association-in-fact of individuals and entities engaged in a shared purpose: the deceptive and fraudulent extension, enforcement, and collection of unlawful merchant cash advances.

130. The enterprises had an ongoing structure and continuity, including but not limited to shared funding sources, similar contract templates, coordinated enforcement practices, and a network of communications used to further the scheme.

131. Defendants functioned as a unit, with each participant playing a specific role in the common course of conduct designed to defraud merchants and circumvent usury laws.

### RICO PREDICATE ACTS

132. Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5), including:

a. Extortion under the Hobbs Act, 18 U.S.C. § 1951;

b. Collection of Unlawful Debt, 18 U.S.C. § 1961(6);

c. Wire Fraud, 18 U.S.C. § 1343;

123. (Wire Fraud Particulars – 18 U.S.C. § 1343). Defendants devised and intended to execute a scheme to defraud merchants, including Plaintiffs, by inducing them to enter transactions documented as "purchases of future receivables" but structured and enforced as absolutely repayable, fee-laden loans with usurious and unconscionable effective rates.

124. Defendants also employed a scheme known as "carroting," wherein Defendants promised their victims long-term financing if and only if they took out and fully repaid one of the Enterprise's criminally usurious MCA Loans.

**A. The Culpable Persons**

130. Greenwald is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

131. Raskin is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

132. Raskin is the sole member of Masada, which has less than five employees.

133. Louz is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

134. Louz is the sole member of Timeless and the nephew of Greenwald, which has less than five employees.

135. Gotham Capital is a person within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

136. Greenwald, Raskin and Louz conducted and participated, directly and indirectly, in the affairs of the Enterprises through their role in soliciting Plaintiffs, transmitting and/or

causing the transmission of deal terms and documents, and obtaining fees and payments in connection with the unlawful transaction described herein.

**B. The Enterprises**

137. Defendants constitute an Enterprise (the “Enterprise”) within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

138. The Enterprise is associated-in-fact through ongoing business relationships, contractual arrangements, and coordinated conduct for the common purpose of carrying on an ongoing unlawful enterprise.

139. Specifically, the Enterprises have a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

140. Since 2022 and continuing through to the present, the members of the Enterprises have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

141. The Enterprises consist of at least the following entities: Masada, Timeless, EZ Capital, Gotham Capital, Greenwald, Raskin and Louz.

142. The debt, including such debt evidenced by the agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40, Fla. Stat. §§ 687.03, 687.04, 687.071(7), and Conn. Gen. Stat. § 37-4.

143. The Enterprise's conduct included repeated uses of interstate wires and electronic banking systems as described in the Loan Agreements, including emails, electronic execution of transaction documents, wire transfers, and ACH debits in furtherance of the scheme.

144. Thier repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**C. The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise**

145. The RICO Persons have organized themselves and the Enterprises into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit, in order to accomplish the common goals and purposes of collecting unlawful debts including as follows:

**i. The Enterprise Principals: Greenwald, Raskin and Louz**

146. Greenwald, Raskin and Louz are Managing Members of the Enterprises (the "Principals").

147. Each is responsible for the day-to-day operations and success of the Enterprises and have final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

148. In their capacity principals, Greenwald, Raskin and Louz are responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an

unlawful debt; (ii) the method of collecting the weekly payments via ACH withdrawals; and (iii) the form used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.

149. All such forms were used to make and collect unlawful loans including, without limitation, loans extended to Plaintiffs.

150. As Managing Members, Greenwald, Raskin and Louz took actions and coordinated, caused, and directed other enterprise associates in furtherance of the overall goals and purposes of the Enterprise, including, but not limited to the origination, servicing, and unlawful collection of MCA Agreements, the overcollection of funds and exorbitant fees from Plaintiffs account.

151. Greenwald, Raskin and Louz are responsible for soliciting borrowers for the Enterprises, negotiating terms, and assisting with collecting upon the unlawful debt.

152. Greenwald, Raskin and Louz have ultimately benefited from each of the Enterprise’s funneling of the usurious loan proceeds to the other Enterprise members.

**ii. The Enterprise MCA Companies: Masada, Timeless, Gotham Capital and EZ Capital**

153. Masada,Timeless, Gotham Capital and EZ Capital maintain officers, books, records, and bank accounts independent of the other Enterprise members (“the Enterprise MCA Companies”).

154. The Principals have operated the Enterprise MCA Companies as part of an unlawful enterprise to collect upon unlawful debt and to engage in racketeering activity, including the repeated use of interstate wires and electronic banking systems as described herein.

155. Pursuant to their membership in the Enterprise, the Enterprise MCA Companies have: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's fraudulent and usurious loan transactions, and participation agreements with Investors to fund such loans; (ii) pooled the funds of Investors in order to fund each fraudulent, usurious loan; (iii) underwritten the fraudulent and usurious loans, determining the ultimate rate of interest and repayment structure under each; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the fraudulent and usurious loans; (vi) set up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (vii) obtained judgments and settlements in its name to further collect upon the unlawful debt.

**E. Interstate Commerce**

130. The Enterprises are engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

131. Specifically, members of the Enterprises maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in New York, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

132. In the present case, all communications between the members of the Enterprises were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications.

133. Specifically, the Enterprises used interstate emails to originate, underwrite, service and collect upon the agreements, fund the advances under each of the agreements and collect the payments via interstate electronic ACH debits.

134. In addition, at the direction of the Principals, each of the agreements were executed in the State of New York, by Defendants, at their offices in New York.

**F. Injury and Causation**

135. Plaintiffs have been and will continue to be injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c), including through the collection of unlawful debt and the pattern of racketeering activity alleged herein, in an amount to be determined at trial.

136. Such injuries include, without limitation, improper fees and upfront deductions, amounts collected through the remittance/ACH structure, associated bank fees and operational dislocations, and other business losses to be proven at trial.

137. Plaintiffs were forced to make weekly payments pursuant to the MCA Agreements that amounted to unconscionable interest rates.

138. Under controlling New York law, the MCA Agreements are void ab initio. *See Adar Bays, LLC v. GeneSYS ID, Inc*., 2021 WL 4777289 (N.Y. Oct. 14, 2021).

139. The VYC loan is also unenforceable under Florida law. *See* Fla. Stat. §§ 687.03, 687.04, 687.071(7).

140. Plaintiffs have also engaged in a pattern of racketeering through wire fraud.

141. Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

142. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
**(Conspiracy to Violate RICO – 18 U.S.C. § 1962(d))**

162. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

163. Defendants knowingly agreed that a conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity and/or the collection of unlawful debt, and Defendants knowingly joined and participated in that agreement, in violation of 18 U.S.C. § 1962(d).

164. Defendants each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs to collect upon unlawful debts, including the Agreement, thereby agreeing to violate 18 U.S.C. § 1962(c).

165. Each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Enterprise Members shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

166. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs through the use of interstate wires and electronic banking systems, including emails, telephone communications, electronic signature platforms, wire transfers, and ACH debits, to solicit, document, fund, service, and collect the unlawful obligations, including the Agreement.

167. The participation and agreement of Defendants and each Enterprise Member was necessary to allow the commission of this scheme.

168. Plaintiffs have been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

169. The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments and lost profits.

170. Plaintiffs were forced to make weekly payments pursuant to the MCA Agreements that amounted to unconscionable interest rates.

171. Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

172. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

**THIRD CAUSE OF ACTION**
**(Fraud)**

173. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

174. Defendants fraudulently induced Plaintiffs into entering into the MCA Agreements by misrepresenting that they would receive future financing in the form of a long-term, low interest loan if they successfully took out and fully repaid one of their criminally usurious MCA Agreements.

175. Defendants knew these representations were false and had no intention of providing Plaintiffs with a long-term, low interest loan.

176. But for these knowingly false representations by Defendants, Plaintiffs would not have entered into the MCA Agreements with Defendants.

177. Plaintiffs fully performed by entering into the MCA Agreements with Defendants and fully paying off the MCA Agreements as required to fulfill the promises made to them.

178. Defendants did not provide the long-term, low interest loan promised.

179. Defendants' knowingly false misrepresentations were a direct and proximate cause of Plaintiffs' damages, including amounts paid in excess of amounts received (including upfront broker and origination charges).

180. Defendants' conduct shocks the conscience and was in reckless disregard of Plaintiff's rights.

181. Defendants' conduct was part of an ongoing and systematic fraudulent scheme perpetrated on the public at large.

182. Plaintiffs are entitled to recover compensatory damages in an amount to be determined at trial, plus punitive damages and any other relief as the Court deems proper.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract, in the alternative)**

183. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

184. Under the express terms of the Masada MCA Agreement, VYC was entitled to an early pay discount if it paid the balance owed within 20 days of funding. *See* Ex. 4.

185. VYC fully repaid Masada within 20-days, and thus, Masada was only permitted to collect $255,000.

186. Despite complying with the terms of the early pay discount, Masada collected $316,952, resulting in breach of contract damages of at least $61,952, plus prejudgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against all Defendants, jointly and severally, and grant the following relief:

i. On the First Cause of Action, awarding Plaintiffs treble damages pursuant to 18 U.S.C. § 1964(c), plus attorneys' fees and costs;

ii. On the Second Cause of Action, awarding Plaintiffs treble damages pursuant to 18 U.S.C. § 1964(c), plus attorneys' fees and costs;

iii. On the Third Cause of Action, awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial;

iv. On the Fourth Cause of Action, awarding Plaintiff VYC compensatory

v. Awarding pre- and post-judgment interest as permitted by law; and

vi. Awarding such other and further relief as the Court deems just and proper.

Dated: New York, New York
May 6, 2026

HESKIN & PROPER, PLLC

By: /s/ Shane R. Heskin
Shane R. Heskin
641 Lexington Avenue, 14th Floor
New York, New York 10022
shane@heskinproper.com
Attorney for Plaintiffs